## People ex rel., Dickinson v. Thomas L. Sackett.

*Quo Warranto. When new trial granted.* When issues in Quo Warranto are sent down to the Circuit to be tried, a refusal to grant a continuance will be no ground for a new trial, unless it is made to appear affirmatively that the party aggrieved has been improperly deprived thereby of material testimony, which he would otherwise have been able to obtain; and the materiality must be shown.

If a new trial can be granted at all, on a claim that the verdict was against evidence, when the Judge, who tried the cause, certifies that he was satisfied with the result, it can only be, when, from the evidence reported, there can be no doubt of the impropriety of the verdict.

A new trial will not be granted upon the ground of newly discovered evidence, unless it is of a very clear and satisfactory character, and such as will probably seriously affect the result, if admitted.

*Witness, when may be contradicted.* When a witness is recalled after the case has been closed on both sides, and asked by the Court upon the application of either party, when a dispute arises, to state what he had sworn on the stand upon a given fact, and his answer agrees with what the Judge certifies it to have been before, it is not error to refuse to permit another witness to be called to contradict him on the fact in question.

THE PEOPLE *v.* SACKETT.

*Motion to amend pleadings, when denied.* When a party seeks to amend his pleadings upon a given point, and his affidavit shows that the plea would not accord with the facts, his motion must be denied.

*Inspectors of elections, effect of irregularity.* When inspectors of elections postponed the canvass of votes against the direction of a statute requiring an immediate canvass, their conduct severely condemned.

Irregularities on the part of election officers do not of necessity destroy the election, although they may require it to be subjected to a rigid scrutiny.

*Heard May 20th.    Decided June 1st.*

The motion for a new trial of the issues of fact in this cause, and for leave to amend the pleadings therein, which was heretofore argued, (see *p.* 243 *ante*), was now re-argued upon the affidavits filed for and against the motion, and upon the report of the Circuit Judge of the Sixth Circuit of the proceedings in the Circuit Court, for the county of Macomb, upon the trial of said issues of fact.

*A. B. Maynard,* for the motion.

*Wm. P. Wells* and *G. V. N. Lothrop,* contra.

CAMPBELL J.

This is a case wherein the relator is contesting with the respondent the title to the office of Register of Deeds for Macomb County, by proceedings under an information in the nature of a quo warranto. The pleadings admit that the relator was returned as having the majority of legal votes, but issues are tendered setting up several irregularities and mistakes, which seem to have been confined chiefly to the towns of Clinton and Sterling. Upon the pleadings several issues were framed and sent down to Macomb County for trial, where a jury in January last made separate findings on each, which were returned to this court. A motion was made by the respondent, early during the present term, for a new trial, which was based upon alleged errors in the ruling of the Circuit Judge, and upon newly discovered evidence, and upon a claim that the verdict was against evidence. Upon the hearing of the motion we ordered that the parties should obtain a report from the judge who tried the cause, and that

14 MICH.—2 D.

the motion should be suspended until the report was brought in. That report is now on file and the matter has now been re-argued upon the several points raised.

The first ground relied upon is that the Judge improperly refused a continuance. An affidavit was presented to him on the first day of the term of his court, showing in the usual form the absence of a witness supposed to be material. He expressed an opinion that he could not, under the order of this Court remitting the issues for trial, continue the cause over the term, but gave an adjournment of a week. On the adjourned day he was asked whether he adhered to his opinion, as the respondent proposed, if he did not, to make a further showing of the absence of witnesses, in order to renew the motion for a continuance. The Judge adhered to his former opinion, and did not inquire into the merits of the first affidavit, and no further affidavits were offered.

The order of this Court was not designed to prevent any continuance, where justice might require it to be granted, and under such a ruling as was made, we think a new trial should be granted, if it should appear that the refusal to continue had deprived the respondent of any material testimony; and we do not think the fact that no additional affidavits were presented to the Judge on the adjourned day, should prejudice him, when he was notified they would not be considered. But the affidavits now before us do not show that any material testimony was lost by the denial of a continuance. And as respondent is the only one who is able to inform us what witnesses he had discovered whose testimony he desired to secure by such continuance, it was incumbent upon him on this motion to name them and show wherein their testimony would have aided him. There are but two witnesses named as being material witnesses of whose testimony he might have made use had time been granted him, and those witnesses now appear very plainly not to have been material in his behalf. As we are not shown in any way that the ruling of the Judge was at all prejudicial to the respondent, he is not

entitled to a new trial by reason of the erroneous view taken of the order transmitting the cause for trial.

Upon the trial the ballots cast in the town of Clinton were examined and counted before the court and jury, and three votes were found to have been allowed in favor of Dickinson, which should have been allowed to Sackett, whose slips had been overlooked in the canvass. It was further claimed that it would appear from the ballots that the name of Dickinson had been erased from two ballots which had nevertheless been counted in his favor. The judge, upon objection, refused to allow that inquiry to be pursued, because it was not within any of the issues. The respondent now sets up what he claims to have been the facts in this matter, and moves for leave to amend the pleadings and issues, so as to remedy the deficiency. The point was foreign to the issues framed, but we think it proper to consider how the real facts stand on the respondent's affidavit, in order to determine the propriety of passing upon the new motion. In his affidavit Sackett shows that there were 510 ballots cast in Clinton; that of these there were 284 purporting to be straight Democratic tickets, on three of which respondent's name had been pasted over that of the relator. A second package, purporting to consist of fifty split Democratic tickets, were thirty-six for Sackett, and thirteen for Dickinson, and from the remaining one Dickinson's name had been erased. The package of straight Republican tickets, 144 in number, were all in favor of Sackett. The split Republican tickets, thirty-two in number, were twenty-five for Sackett, and seven for Dickinson. There was but one ticket erased, all the others being sworn by Sackett to have been as above stated. The names of the candidates for other offices were printed on the same ballots. It appears from Sackett's affidavit that of these 510 ballots 301 were correctly given for Dickinson, 208 for Sackett, and one with an erasure which he claims should vitiate it. But it appears from the official canvass that while there were 510 ballots cast, only 509 were counted for Sackett and Dickinson, and

one was thrown out, so far as the vote for Register was concerned. It is evident, therefore, that this erased vote was not counted, and no occasion can arise for making any further issues dependent on it, if they should be deemed admissible otherwise, which we do not now decide.

It appeared from the testimony introduced by the respondent, Sackett, that in the town of Sterling there had been one vote too many found in the ballot box, as shown by the canvassing, and that a ballot was thereupon withdrawn in the usual way. A witness, Brownell, one of the Board, had testified that the ballot withdrawn was found to be a Republican ticket. After the case was closed, a dispute arising whether Brownell had testified it was a "Republican" or a "straight Republican" ticket, he was recalled, under objection, and asked by the Court to state what he had testified to, and replied that he had stated it was a "Republican" ticket, and had not said it was a "straight Republican" ticket. Respondent thereupon offered to call another witness, Sumner, to show that it was, in fact, a straight Republican ticket; but the Court refused to permit it. Had Brownell been called at that stage of the trial to prove any new fact, we should feel disposed to hold that it should have been allowed to be met by counter evidence. But he was only called to repeat what he had said before, and the Judge certifies that his previous testimony was what the witness said it was. There was, therefore, no propriety in undertaking to introduce what would have been new and independent proof, and the Judge was right in excluding it.

It is also claimed that the verdict was against evidence. It appears that the case was fairly presented. There was some conflicting testimony, but the Judge who tried the case was satisfied with the finding, and we discover nothing which convinces us that the jury were not warranted in arriving at their conclusions. If the finding of a jury, which is satisfactory to the Judge who tried the cause, can ever be set aside as against

THE PEOPLE *v.* SACKETT.

evidence, it must be under very peculiar and convincing circumstances. We do not find such in the present case.

The only remaining ground is, that there is newly discovered evidence. Two witnesses are named. One, Levi J. Stickney, knows nothing which could have affected the finding. The other, Waters, would have been a competent witness, and his testimony would not be immaterial. But it is not of such a character that we can say we feel convinced that it would be at all decisive. After a full trial, newly discovered evidence, in order to warrant setting aside the verdict, should be of the most satisfactory character. The witness, according to his own showing, has made and sworn to an affidavit which he knew to be incorrect, upon the faith that the Notary would subsequently correct it. From a witness who is so careless, we should require a very clear showing, before we could properly open a verdict to permit him to testify in the cause. But we do not think the case made sufficient in itself, and do not, therefore, govern our action by the fact that he has been heedless in his statements. We think enough is not shown to warrant us in disturbing the finding.

There is no excuse for the conduct of the Inspectors of Sterling in adjourning the canvass of the ballots, contrary to the plain directions of the statutes, which were expressly designed to guard against fraudulent tampering with votes before counting. This conduct was probably the chief cause of the present litigation, and we think it gave rise to a necessity for subjecting the vote of that town to a very careful scrutiny. But as this matter was very fully covered by the issues, and the jury have passed upon it, and the testimony was such as to authorize their finding, we see no occasion to disturb the verdict.

The motion for a new trial and for leave to amend the pleadings must be denied.

MARTIN CH. J. concurred.

COOLEY J.

The affidavit of defendant to show errors in the canvass of Clinton, not corrected on the trial, does not, to my apprehension, establish that fact; and we cannot, therefore, grant a new trial based upon that branch of the case. The Circuit Judge clearly misapprehended the order sending down the issues for trial when he decided that he had no power to grant an adjournment; and for this error of law a new trial ought to be granted, if there was any reason to suppose the defense had been prejudiced in consequence. But it is quite clear from the affidavit of Finch, not only that due diligence had not been used to procure his testimony, but also that if procured it could have been of no service; and in the shape in which Koth's statements appear before us, I do not think we should be warranted in opening the case on any supposition that his evidence would be of weight in it. These are the only witnesses in respect to whom it can be claimed that a continuance should have been granted. As declining to allow Sumner to be called was clearly matter of discretion, the case must now depend upon the showing of newly discovered evidence as to frauds in Sterling, and upon the objection that the verdict is against the evidence. Upon the latter point I feel bound to say that if the case were one where the Court, upon the evidence as spread out upon paper, was at full liberty to pass upon the facts, in my opinion it would be our duty to grant a new trial. The facts seem to be that the inspectors of election in Sterling, at the close of the poll, instead of immediately proceeding to a canvass of the votes in the presence of the electors, as the law required, adjourned that duty to a late hour in the forenoon of the next day, when they proceeded to make up their certificate which has probably been accepted as official since. The law does not authorize such an adjournment; but on the contrary, its mandatory provision is so clear and plain, and based upon reasons of so imperative a character, that any such excuse, as is offered here, would be idle and

frivolous if interposed as a defense to a prosecution of these inspectors for criminal non-feasance. The change from the old law, which allowed adjournments, was based upon a profound conviction in the public mind, that these adjournments afforded the opportunity for frequent and gross frauds upon the elective franchise, which could never be fully brought to light, and very rarely punished. Indeed, while the adjournments afforded full opportunity for the fraud, there was usually no means whatever of doing anything towards correcting it, except by putting the electors themselves upon the stand and compelling them to disclose for whom they voted. But this course is also exceedingly dangerous, as well as distinctly opposed to the policy of our election laws, which are designed to throw around every man's ballot the protection of inviolable secrecy. We know from common experience that a large proportion of those electors who do not vote the straight party ticket, are usually unwilling that fact should be known; and that many who do, have frequently as good reasons for not disclosing the real facts. And any investigation as to the actual votes cast, is almost certain to bring out prevarications, if not perjuries, such as, I trust, are rare in legal investigations on most subjects. Nor is this all; for the temptation to actual fraud and corruption on the part of candidates is never so great as when it is known precisely how many votes will change the result; and the man who will sell his vote before election would quite as readily sell his testimony afterwards, especially as in most cases there is no possible means of detecting perjury when committed.

But these inspectors not only adjourned the canvass, but they failed to surround the ballots, in the mean time, with any of those precautions which would have been reasonably expected of them. The box had upon it an ordinary lock, which any one would probably have found a key or other implement to open, on very brief search. A paper was wafered over the opening, but this would be so easily removed and replaced, that it would be the height of presumption to attach impor-

tance to the negative evidence that the next morning there was no appearance of its having been disturbed. Instead of one of the inspectors keeping the box within his own control, where he could have a constant oversight of it, it was deposited by him on a table in a lawyer's office, where it remained until the next day. It is not suggested that any precaution was taken to guard it there, beyond the fact that one of the inspectors took a key to the office door; but as the occupant of the office also retained a key himself, it is apparent that this, for any purpose of protection, was entirely an idle ceremony. Unless the office was more perfectly protected from violation than the evidence informs us, it is not at all probable that its occupant would have left moneys or other valuables exposed upon the table as this box was left. He was a candidate upon one of the tickets, but was aware that the course which was being taken was improper, and had advised the inspectors that it was their duty to proceed to a count of the votes at once.

The adjournment that was had was sufficiently long, so that parties interested might have ascertained the result in the rest of the county, and known precisely the extent of the fraud necessary to change the result. No reason is assigned for adjourning to so late an hour, but there was every reason, commonly influencing men taking an interest in elections, to induce the earliest convenient count of the votes; especially as the election proved, and was probably expected to be a close one.

Now there is nothing in all these circumstances which fixes dishonesty upon these inspectors, or which is inconsistent with just intentions on their part. They only show that while distinctly disobeying the law, they took no proper precautions to prevent that disobedience leading to fraud. But it was not necessary to show fraud in order to cast discredit upon their subsequent certificate of the result. For sixteen or eighteen hours, when they made their canvass, the ballot box and the ballots had been neither actually nor constructively in the

possession of the law or of its officers. The box had been left, as I have stated, in a public office. One of the inspectors retained a key to the office, but he could not, by virtue of that fact, be held constructively in possession, when the owner and occupant not only retained a key, but also the general possession. Moreover, any constructive, legal possession which officers have, ceases when they make a disposition of the thing possessed, which the law forbids. At that point, the legal presumption which supports their possession and sustains their acts, ceases. In the absence of any showing to the contrary, the law presumes that an official has performed his duty, and that all has been rightly and properly done; but there is no room for presumption when the contrary appears. The canvass made by these inspectors the day succeeding the election, was an unofficial act. They get their whole power to canvass and give certificates from the statute, and that only empowers them to canvass and ascertain, and declare the result officially, immediately on the closing of the poll. There is no room for saying that this statute is merely directory; the change from the old law is significant, and was adopted not only to prevent frauds, but also to make the public witnesses to the fairness with which our election laws are administered.

The extreme uncertainty and dangerous character of evidence of electors in regard to their votes, was forcibly stated on the argument, and I assent fully to all that was said. In principle, such evidence is only admissible because absolutely the only — though exceedingly doubtful and unsatisfactory — means by which gross frauds upon the ballot box can possibly be detected. But if such evidence is unsatisfactory, how much more so is the ballot box itself, where it has remained so long substantially unprotected, actually inviting outrage, with almost perfect immunity against discovery. The case now before us forcibly illustrates the wisdom of the statute which requires an immediate canvass. A doubt is thrown over the actual result of this election which can never be cleared up. The appearance of the testimony on paper is one way, and the

verdict of the jury the other. One party charges the other with tampering with the ballot box, and is in turn charged with tampering with witnesses. Each is or can be charged with perjury or subornation of perjury. All this comes from failing to obey a plain provision of the law, which would have effectually precluded all suspicion, and left the public mind to rest in confidence that the officially declared result accorded with the expression of the voters by their ballots.

I think the defendant would have been entitled to a charge from the Circuit Judge that the adjournment of the canvass was unauthorized by law, and the canvass, when made, unofficial, and no evidence of the number of votes cast. It was just as much so, in my opinion, as a canvass that should be made by the presiding officer of the United States Senate, of the votes cast for President and Vice President when the two houses of Congress are not present. The legal conditions authorizing the canvass did not then exist. The adjournment being unauthorized by law, the inspectors were no more legally together the next day for the purposes of a canvass, than if they had adjourned without day, without any count, and come together by agreement on some subsequent day for the purpose of making it. The adjournment took the matter beyond their jurisdiction. No state has been more careful than this to surround the ballot box with safeguards, and we should do violence to the whole spirit and intent of our statutes if we should hold that, in provisions like this, the inspectors might obey the law or not at their option. The time of the canvass, like the time for holding the election, and provisions in regard to registry, is indeed the very substance of the statute.

But this case has been passed upon by a jury, and no exceptions were taken to the charge of the Circuit Judge. The charge is therefore to be presumed in all respects correct. The jury have found no actual fraud, and the Judge certifies his satisfaction with the verdict. Although we have still the power to set aside the verdict, I do not think we are at liberty to do so on the ground solely that the evidence, as exhibited to us

here, might lead us to a different conclusion. It is not our province to pass upon the facts, and if it were we should not be at liberty to close our eyes to the fact that the Judge and jury before whom the witnesses appear, are better qualified to judge than we can possibly be. But I am unwilling the case should be disposed of, without expressing my opinion of the illegal, dangerous, and wholly inexcusable character of the act of these inspectors, in thus adjourning the canvass, thereby leaving the case forever open to the painful suspicions and doubts which now surround it.

The only remaining inquiry is, whether a new trial can be granted for the newly discovered evidence of frauds in Sterling. The only material evidence shown is that of Waters. So far as this would tend to establish fraud, it is only cumulative, and therefore not sufficient under the general rule. So far as it tends affirmatively to show that defendant received another vote in that township, my brethren think it not satisfactory; and in view of its uncertain character, and the manner in which Waters has given affidavits in the case, I assent to that conclusion.

The foregoing opinions having been delivered, the case came on for final hearing upon the verdict of the jury and upon demurrers to several pleas, which rested the defense upon the irregularities above referred to, as avoiding the election in the towns mentioned.

MARTIN CH. J. and CAMPBELL J. were of the opinion that the relator was entitled to judgment.

COOLEY J. concurred, remarking that the irregular and illegal action of the inspectors, though it might deprive their certificate of official force, could not take from the electors their right to have their votes counted and allowed in the general result.

Judgment of Ouster and that the relator was entitled to the office.